UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ALAN JOE ROYAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:14-cv-135 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, Alan Joe Royal, on May 2, 2014. For the following reasons,

the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Alan Joe Royal, filed an application for Disability Insurance Benefits on

March 2, 2011 and Supplemental Security Income on March 8, 2011, alleging a disability onset

date of December 9, 2010. (Tr. 162, 169). The Disability Determination Bureau denied Royal's

application on April 28, 2011, and again upon reconsideration on July 26, 2011. (Tr. 104, 115).

Royal subsequently filed a timely request for a hearing on October 14, 2011. (Tr. 21). A hearing

was held on September 17, 2012, before Administrative Law Judge (ALJ) William D. Pierson,

and the ALJ issued an unfavorable decision on November 1, 2012. (Tr. 21, 33). Vocational

Expert (VE) Joseph Thompson and Jessica Royal, Royal's wife, testified at the hearing. (Tr. 21).

The Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner. (Tr. 13–15).

At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Royal had not engaged in substantial gainful activity since December 9, 2010, his alleged onset date. (Tr. 23). At step two, the ALJ determined that Royal had the following severe impairments: minimal spur/disc complex at C2-3, lumbar degenerative disc disease, and mild right carpal tunnel syndrome. (Tr. 24). Also at step two, the ALJ stated that Royal had a more recent diagnosis of fibromyalgia. (Tr. 24). At step three, the ALJ concluded that Royal did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 25).

The ALJ then assessed Royal's residual functional capacity as follows:

> [T]he claimant is limited to lifting, carrying, pushing and pulling 10 pounds frequently and occasionally throughout the workday. He is able to stand and/or walk for a total of 2 hours and sit for a total of 6 hours in an eight-hour period. He can frequently handle and finger with his dominant hand and upper extremity and can constantly handle and finger with his non-dominant hand and upper extremity. He must alternate between sitting and standing every 45 minutes while remaining on task.

(Tr. 25). The ALJ explained that in considering Royal's symptoms he followed a two-step process. (Tr. 25). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Royal's pain or other symptoms. (Tr. 25). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Royal's functioning. (Tr. 26).

In August 2009, Royal underwent a L5-S1 discectomy with left S1 nerve root decompression. (Tr. 26). The surgeon, Dr. Hoffman, stated that Royal was able to resume normal activities within four weeks. (Tr. 26). The ALJ found it appeared that Royal returned to

substantial gainful work activity in 2010, but Royal alleged disability beginning December 9, 2010. (Tr. 26).

The ALJ concluded that the record supported the finding that Royal had severe back and neck problems and right carpal tunnel syndrome. (Tr. 26). A late 2010 MRI of his lumbar spine revealed a recurrent disc extrusion at L5-S1 that abutted the left S1 nerve root, a stable disc protrusion at L4-5 that mildly deformed the thecal margin, and degenerative disc disease at L4-5 and L5-S1. (Tr. 26). Additionally, a late 2010 MRI of his cervical spine discovered that Royal had a disc/spur complex at C2-3. (Tr. 26). In June 2012, an electrodiagnostic study indicated a chronic bilateral L5 and S1 radiculopathy, and a September 2012 electrodiagnostic study found that Royal had right-sided carpal tunnel syndrome. (Tr. 26). The ALJ also found that Royal suffered from obesity and had a body mass index of 32.6. (Tr. 26).

For treatment, Royal received chiropractic treatment, physical therapy, hot baths, icing his neck, caudal, and epidural steroid injections. (Tr. 26). Additionally, he took the following medications: Cyclobenzaprine, Cymbalta, Chlorzoxazone, Gabapentin, Vicodin, Meloxicam, Naproxen, Tramadol, Morphine, Ibuprofen, and Oxycodone-Acetaminophen. (Tr. 26). Royal alleged that cold and activity worsened his pain but that lying down helped. (Tr. 26). Furthermore, he claimed he spent four days per month solely alternating between lying in bed and taking hot baths. (Tr. 26). The ALJ concluded that Royal sought the above treatment but that the record did not support such limiting symptoms that required Royal to lie in bed and take hot baths four days per month. (Tr. 26).

Royal alleged a constant grinding pain in his middle and lower back and that he had difficulty standing and walking due to weakness, fatigue, numbness, burning pain, and leg spasms. (Tr. 26). Additionally, he claimed he used a cane, had difficulty bending and sleeping,

was limited to sitting for thirty minutes and standing for twenty-five minutes, and could not pick up a gallon of milk.  (Tr. 26).  His wife alleged that Royal could not do anything and that he constantly adjusted his position.  (Tr. 26).

The ALJ concluded that the objective medical evidence did not support the degree of limitations alleged by Royal and his wife.  (Tr. 26).  The record demonstrated that Royal received a second lumbar spine surgery in February 2011, but that Dr. Shugart's medical records indicated that Royal said his back and legs were not too bad.  (Tr. 26–27).  Additionally, Royal's main complaint involved his neck and arms, although he reported some leg numbness.  (Tr. 27).  He exhibited a 5/5 in strength and intact reflexes and exhibited a non-antalgic gait, negative heel-toe walking, and negative straight-leg-raising.  (Tr. 27).  Furthermore, Dr. Shugart gave Royal no restrictions.  (Tr. 27).  The ALJ found the above facts and objective medical evidence inconsistent with Royal's claim of disabling function limitations due to lumbar degenerative disc disease.  (Tr. 27).

The ALJ also found that Royal did not aggressively and frequently seek or receive ongoing treatment for low back and leg symptoms in 2011, which the ALJ found supported his credibility finding.  (Tr. 27).  The ALJ noted that Dr. T. Miller's medical records from June and August 2012 did not demonstrate any abnormal findings for Royal's lumbar spine, that March 2011 arthritis panels were negative, and May 2012 ANA, RA, and SED rate screenings reflected no significant abnormalities for Royal's back and lower extremities.  (Tr. 27).

In June 2012, Royal reported that Cymbalta helped his symptoms and that the burning sensations in his legs had resolved.  (Tr. 27).  Additionally, the objective medical evidence indicated that Royal could transition from seated to standing positions and could get on and off exam tables independently and without difficulty.  (Tr. 27).  Royal exhibited positive reflexes

and full lower extremity strength at 5/5, despite an absent left ankle reflex. (Tr. 27). The ALJ also noted that a May 2012 examination revealed negative straight leg raises, 5/5 strength, a non-antalgic gait, and a normal heel and toe walk. (Tr. 27). The ALJ concluded that the above objective medical findings did not support Royal's claim that a more restrictive RFC was necessary due to back and lower extremity weakness. (Tr. 27).

The ALJ found Royal incredible because he reported to Dr. Shugart that his back and legs "are not too bad" on May 25, 2011, but then he told Nurse V. Bradley in May 2012 that the second surgery did not improve his pain. (Tr. 27). In June 2012, Royal reported back and leg pain at only "1-2/10" and he exhibited 100% of general active and passive ranges of motion in his spine, arms, and legs and 75% of lumbar active flexion. (Tr. 27). He also exhibited strength of 4/5 and 5/5 for his leg and buttock muscles. (Tr. 27). Although he had a decreased left S1 achilles reflex, Royal demonstrated a normal gait and balance. (Tr. 27). However, Royal had a slight tenderness over the lumbar paraspinals and physical therapy was recommended. (Tr. 27). The ALJ determined that the above medical evidence supported his RFC assessment. (Tr. 27).

The ALJ stated that Royal used a cane despite no treating physician prescribing one. (Tr. 28). Furthermore, the ALJ found the record unclear whether a cane, even if prescribed, would be needed for balance or walking on difficult terrain. (Tr. 28). The ALJ concluded that Royal appeared comfortable at the hearing, remaining seated did not appear to strain him, and he could move his hands to speak without needing them for support. (Tr. 28). Royal alleged his legs were burning and shaking, but the ALJ did not notice much change in Royal's demeanor or stance. (Tr. 28).

Royal alleged severe neck pain that made it difficult to hold his head up or even lift a remote. (Tr. 28). He also stated he could not turn his neck at times, his arms and hands became

stiff and tired, he experienced numbness in his hands and arms, and he had difficulty holding his arms on a steering wheel. (Tr. 28). Dr. Miller's notes indicated complaints of paresthesia in Royal's upper extremities in May 2011, and magnetic resonance imaging revealed some degenerative disc disease. (Tr. 28). However, the ALJ concluded that the objective medical evidence did not support the degree of limitations that Royal alleged. (Tr. 28).

The ALJ admitted there was MRI evidence of a spur/disc complex at C2-3, but he stated it was described as "minimal" and there was no evidence of thecal mass effect, stenosis, or foraminal stenosis in Royal's cervical spine. (Tr. 28). Additionally, the ALJ noted that Royal did not aggressively seek or receive treatment for cervical complaints since the alleged onset date. (Tr. 28). Arthritis panels in March 2011 and May 2012 were negative, and there was no evidence that Royal underwent cervical spine surgery or that one was recommended since the alleged onset date. (Tr. 28).

June 2012 physical therapy notes indicated general and passive ranges of motion of 100% of the spine and upper extremities. (Tr. 28). Also at that time, Royal exhibited grip strength of 105 pounds on the right and 120 pounds on the left, but he showed decreased strength in his neck flexors and decreased cervical flexion and extension. (Tr. 28). Royal had slight tenderness over the cervical paraspinals but did not exhibit a loss of reflexes in his upper extremities. (Tr. 28).

The ALJ found that Dr. Miller's treatment notes from June 2012 through August 2012 did not document objective medical evidence that supported Royal's claims of disabling symptoms and function limitations, and he was found in no acute distress during that period. (Tr. 28). When Royal completed physical therapy in August 2012, he alleged burning upper extremity symptoms and weakness but exhibited pain free lumbar and cervical motion and

improved strength and stabilization. (Tr. 28). The ALJ indicated that the above findings supported the conclusion that Royal was incredible. (Tr. 28).

The ALJ indicated that Royal used his hands while talking and appeared able to turn his neck without significant difficulty at the hearing. (Tr. 29). Although Royal claimed he had difficulty driving due to neck and arm problems, he admitted he could drive occasionally. (Tr. 29). A September 2012 electromyography test revealed mild carpal tunnel syndrome and no evidence of cervical radiculopathy. (Tr. 29). The ALJ found the above facts inconsistent with Royal's claim of a cervical impairment more imposing than the RFC assessment. (Tr. 29).

Royal alleged that carpal tunnel syndrome in his right hand caused numbness and made it difficult to grip and pick up small objects. (Tr. 29). He complained to Dr. Miller about right hand symptoms on March 2, 2011, but his right hand felt better and was less swollen by March 30, 2011. (Tr. 29). Royal did not receive surgery for his carpal tunnel syndrome, he could move his hands during the hearing, and his treating physicians did not note any difficulty with handling, fingering, or feeling with his hands. (Tr. 29). Rather, he only exhibited tenderness to palpation of his right hand, minimal swelling, and was missing the second digit on his right hand. (Tr. 29). Royal claimed he could not use a screwdriver, but admitted he could use eating utensils. (Tr. 29). Except for a missing second digit, an x-ray of his right hand was negative. (Tr. 29). Additionally, the missing second digit did not prevent Royal from working as a wire harness assembler, lather programmer, or fork lift driver. (Tr. 29).

Royal also alleged he felt shaky, had frequent headaches lasting two or three days, and he suffered from left ankle and knee pain. (Tr. 29). However, the ALJ noted that he did not aggressively seek or frequently receive treatment for head, ankle, or knee pain. (Tr. 29). Additionally, the medical records did not include a diagnostic testing demonstrating a severe

ankle or knee impairment. (Tr. 29). An x-ray on Royal's left knee was negative, and a physical examination following his second lumbar spine surgery was unremarkable. (Tr. 29). Although Dr. Miller stated that Royal had fibromyalgia in August 2012, the ALJ found no evidence to support a finding that it constituted a severe and unremitting impairment. (Tr. 29). Rather, the ALJ concluded there was no evidence in the record that Royal exhibited the typical fibromyalgia tender points. (Tr. 29).

The ALJ concluded that Royal did not have a severe and medically determinable headache impairment. (Tr. 30). To reach that conclusion, the ALJ noted a number of characteristics about headache impairments that Royal's medical records failed to document. (Tr. 30). First, the ALJ indicated that the headaches were not the result of a serious illness, there were not twelve months of ongoing neurological deficits associated with headaches, and the headaches were not associated with the following for twelve months: fever, weakness, loss of balance, falling, numbness, tingling, confusion, personality or vision changes, shortness of breath, or dizziness. (Tr. 30). Additionally, the headaches did not occur in a cluster or cyclic formation, were not triggered by strenuous activity, exertion, or bending and coughing, and the headaches were not unresponsive to prescribed treatment. (Tr. 30). Furthermore, Royal did not frequently seek emergency room treatment or hospitalization for uncontrollable headaches, and his treating physicians did not document uncontrollable headaches that significantly limited his functions for twelve months in duration. (Tr. 30).

The ALJ indicated that Royal alleged fibromyalgia, which was diagnosed for a short period of time. (Tr. 30). The ALJ stated that Royal may have fibromyalgia type pain, but noted the treatment records and non-medical facts did not indicate pain that precluded full strength or prevented a normal gait. (Tr. 30). Additionally, he concluded that Royal's pain did not limit his

activity to an extent that caused atrophy. (Tr. 30). Rather, the ALJ determined that Royal's pain did not prevent him from walking without deficit, using full motion for his joints, bending, lifting, carrying, sitting, standing, or using full strength of his muscles. (Tr. 30).

Royal claimed he did not do any cooking, shopping, or household chores, and his wife testified that he did nothing. (Tr. 30). The ALJ found that the objective medical evidence did not support those claims because there was no evidence of muscle atrophy, which the ALJ concluded could reasonably be present based on the alleged inactivity. (Tr. 30). Additionally, the ALJ indicated that Royal could drive occasionally, care for his personal needs, watch television, and use a riding mower for short time periods, which the ALJ determined reduced Royal's credibility for the degree of his limitations. (Tr. 30). Furthermore, Royal received unemployment compensation in 2011 suggesting that he told the State of Indiana that he could work but could not find a job. (Tr. 31).

Royal testified he did not experience any medication side effects, except for nausea and a drunken feeling when he took Vicodin. (Tr. 31). The ALJ found that Royal's physicians did not find any persistent or adverse side effects due to prescribed medication. (Tr. 31). The ALJ also found that Royal was not prescribed an assistive device for a prolonged use for the purpose of ambulation, motion, or balance. (Tr. 31). Royal did not seek treatment on a regular basis from a pain clinic or a work hardening program and did not frequently report any acute distress. (Tr. 31). Additionally, Royal was not reported to exhibit significant pain behaviors or signs of abnormal breathing, uncomfortable movement, or elevated blood pressure. (Tr. 31).

At step four, the ALJ determined that Royal was unable to perform his past relevant work. (Tr. 31). Considering Royal's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Royal could perform, including

bench worker (1,000 jobs in Indiana and 30,000 jobs nationally), hand mounter (1,000 jobs in Indiana and 30,000 jobs nationally), and assembler (1,000 jobs in Indiana and 24,000 jobs nationally).

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 423(d)(1)(A)**.  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R. §§ 404.1520, 416.920**.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  **20 C.F.R. §§ 404.1520(b), 416.920(b)**.  If he is, the claimant is not disabled and the evaluation process is over.  If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities."  **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  **20 C.F.R. §§ 404.1520(e), 416.920(e)**.  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job

experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

First, Royal has argued that the ALJ's determination that Royal and his wife were incredible was patently wrong. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. §404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's

impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*, 374 F.3d at 474); *Indoranto*, 374 F.3d at 474; *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional

restrictions, and the claimant's daily activities.  (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2; *see Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); *Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible.  *Bates*, 736 F.3d at 1099.  However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. *Bates*, 736 F.3d at 1099.

Royal has argued that the ALJ erred by drawing negative inferences from his receipt of unemployment benefits without first inquiring into and considering the totality of the circumstances.  "It is not inappropriate to consider a claimant's unemployment income in a credibility determination."  *Miocic v. Astrue*, 890 F. Supp. 2d 1046, 1059 (N.D. Ill. 2012) (citing

***Schmidt v. Barnhart***, 395 F.3d 737, 745–46 (7th Cir. 2005)).  "[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability."  ***Schmidt***, 395 F.3d at 746. However, a disabled claimant may apply for unemployment benefits because he has no other income.  ***Richards v. Astrue***, 370 Fed. Appx. 727, 731 (7th Cir. 2010); *see* ***Raducha v. Colvin***, 2014 WL 4905702, at *9 (N.D. Ind. Sept. 30, 2014) (distinguishing the case from ***Richards*** because the application for unemployment benefits was not the ALJ's sole basis for his credibility determination); *see also* ***Shell v. Colvin***, 2013 WL 5257830, at *23 (N.D. Ind. Sept. 16, 2013) (finding the ALJ erred by not inquiring into the claimant's unemployment benefits when he applied for unemployment benefits before his alleged onset date and received them before his hospitalization); ***Kelly v. Colvin***, 2013 WL 1332203, at *9–10 (N.D. Ind. Mar. 29, 2013) (finding the ALJ properly considered the claimant's unemployment benefits as one of many factors in assessing credibility).

Royal alleged a disability onset date of December 9, 2010 and received unemployment benefits in 2011.  The ALJ considered Royal unemployment benefits application along with a number of other factors in assessing Royal's credibility.  Because the ALJ considered the unemployment benefits among many factors and Royal applied for unemployment benefits after his alleged onset date, the ALJ properly considered Royal's unemployment benefits application in assessing his credibility.

Second, Royal has claimed that the ALJ erred by failing to explain how Royal's ability to mow his lawn and perform other household activities translated into an ability to work full time. However, the ALJ relied on Royal's household activities to determine that his claims were not

entirely credible regarding the degree of alleged limitations, rather than translating Royal's household activities into an ability to work full time as Royal alleged. The ALJ indicated that Royal stated he did not cook, shop, or perform household chores, and his wife testified that he did nothing. However, the ALJ compared that to Royal's other statement that indicated he could drive occasionally, care for his personal needs, watch television, and use a riding mower for short time periods. Based on the conflicting claims, the ALJ found Royal and his wife not entirely credible. The ALJ properly considered Royal's daily activities pursuant to 20 C.F.R. § 404.1529(c)(3)(i). Furthermore, "[a]n ALJ may consider a claimant's daily activities when assessing credibility . . . ." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Third, Royal has claimed that the ALJ erred by determining that he was less credible because he used a cane when one was not prescribed. Royal indicated that he did not need a prescription to use a cane and that a doctor did not need to prescribe one in order for him to credibly use one for ambulation. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist."). The Commissioner distinguished this case from *Parker* by noting that Royal presented no evidence of a need for a cane. The ALJ indicated that the record did not document why Royal needed a cane if one were prescribed. However, the ALJ did not adequately explain why Royal's use of a cane, even if not prescribed, lessened his credibility. Rather, the ALJ simply found it suspicious that Royal used a cane when one was not prescribed, but as discussed above, a cane does not require a prescription. Therefore, the ALJ did not adequately explain why Royal's use of a cane adversely affected his credibility.

Next, Royal has argued that the ALJ erred by finding his statements to Dr. Shugart in May 2011 and to Nurse Bradley in May 2012 inconsistent. After surgery in May 2011, Royal told Dr. Shugart that his back and legs "are not too bad" but then told Nurse Bradley, in May 2012, that the surgery did not improve his pain. (Tr. 27). The ALJ found those statements inconsistent and that they "d[id] not enhance his overall credibility." (Tr. 27). The ALJ did not adequately explain how those statements contradict one another considering they occurred one year apart and Royal reported that his pain was progressively getting worse in June 2012.

Royal also has argued that the ALJ improperly found him incredible because he "appeared comfortable at the hearing" and did not "appear to change much in the form of demeanor or stance." (Tr. 28). Royal alleged that the ALJ used a "sit and squirm" test and that the facts did not support his conclusion. However, the Seventh Circuit repeatedly has endorsed the role of observation in credibility determinations. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000); *see Oakes v. Astrue*, 258 F. App'x 38, 43 (7th Cir. 2007); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) ("[I]t was appropriate for the ALJ to consider her actions during the administrative hearing."). The ALJ determined that Royal did not appear to strain to remain seated and could use his hands to speak without requiring them for support during the hearing. Additionally, he noted that Royal alleged his legs were burning and shaking but concluded that his demeanor and stance did not change much. Although Royal alleged that the facts did not support the ALJ's conclusion, the ALJ reasonably considered Royal's appearance and adequately explained his findings.

Next, Royal has alleged that the ALJ improperly concluded that the objective medical evidence did not support Royal's alleged degree of limitations. First, Royal claimed that the ALJ's conclusion was based on an incomplete, selective review of the objective medical

evidence.  The ALJ cited Physical Medicine Consultant treatment notes from June 2012 that

reflected that Cymbalta helped Royal's symptoms including resolving a prior burning sensation

in his leg muscles.  Royal noted that the ALJ failed to discuss that Cymbalta did not resolve the

numbness and tingling in his legs and argued that the ALJ must at least minimally discuss

evidence that contradicts the ALJ's decision.  However, an ALJ does not need to discuss every

piece of evidence but is only prohibited from ignoring an entire line of evidence that supports a

finding of disability.  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) (citing *Terry v.

Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).  Although the ALJ failed to explicitly note that

Cymbalta did not completely resolve Royal's leg numbness and tingling, he indicated that it

helped his symptoms and had previously discussed Royal's leg numbness during his review of

Dr. Shugart's May 2011 medical treatment records.

Royal further has complained that the ALJ relied on selective portions of his physical

therapy records.  Specifically, Royal argued that the ALJ ignored Royal's lack of improvement

in lower extremity and neck strength and his continued complaints of fatigue.  However, the ALJ

discussed Royal's physical therapy notes from May and June 2012.  (Tr. 27).  The ALJ found

that the physical therapy notes failed to support Royal's claims because he demonstrated initial

lower extremity strength of 4/5 or 5/5 and through physical therapy either maintained his

strength or slightly improved.  (Tr. 27).  Additionally, in support of his finding, the ALJ

discussed Royal's low back and leg pain levels, his pain free lumbar and cervical motion, and his

normal gait and balance.  (Tr. 27).  The ALJ did not ignore Royal's alleged weakness or

depressed muscle strength.

Furthermore, Royal has alleged that the ALJ erred by failing to discuss Dr. Miller's

referral to a rheumatologist and to physical therapy for complaints of pain and tingling in his

legs. However, the ALJ did discuss Dr. Miller's findings including that Royal was in no acute distress during his treatment, had improved strength and stabilization, and exhibited pain free cervical and lumbar motion. The ALJ determined that Dr. Miller's findings failed to support Royal's claims of a more restrictive RFC. Although the ALJ did not discuss Dr. Miller's referral, he adequately discussed the objective medical evidence by reviewing Dr. Miller's findings.

Royal also has alleged that the ALJ based his credibility determination on improper inferences. First, Royal argued that the ALJ drew an improper negative inference based on the lack of "treatment aggressively sought and frequently received for ongoing complaints." The ALJ directed a negative inference against Royal's credibility for his lack of aggressively seeking or frequently receiving treatment for low back and leg symptoms, cervical complaints, severe and unremitting head, ankle, and knee pains, and uncontrollable headaches. (Tr. 27–30). An individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints. SSR 96-7p.

> However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p.

The ALJ did not question Royal about his lack of treatment or indicate that he considered any explanations for the lack of treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (finding that the ALJ drew a negative inference regarding the claimant's credibility for his lack of medical care, but she failed to question him about the lack of treatment during that period); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (explaining that the ALJ must elicit

a reason for failing to pursue medical treatment). Therefore, the ALJ cannot draw a negative inference from Royal's lack of treatment because he did not first consider any explanations for the lack of treatment.

Next, Royal has claimed that the ALJ drew an improper negative inference based on the lack of evidence of atrophy. The ALJ found that Royal did not exhibit any long-lasting muscle loss or muscle atrophy, "which might reasonably be expected if [Royal] were actually as inactive as he and his wife alleged." (Tr. 30). However, it is not clear how the ALJ concluded that someone with Royal's conditions should exhibit muscle atrophy or muscle loss. In *Parker*, the court found that the ALJ did not build an accurate and logical bridge when he concluded the claimant was not entirely credible because she did not exhibit muscle atrophy, extended muscle loss, or extended reflex abnormalities. *Parker v. Colvin*, 2014 WL 6750047, at *10 (N.D. Ind. Dec. 1, 2014). The court found it unclear how the ALJ determined that someone with debilitating back pain should demonstrate muscle atrophy, muscle loss, or reflex abnormalities. *Parker*, 2014 WL 6750047 at *10; *see Rodriguez v. Barnhart*, 2002 WL 31155056, at *6 (N.D. Ill. Sept. 27, 2002) (reversing an ALJ's conclusion that normal deep tendon reflexes and intact leg strength contradicted a claimant's allegation of severe back and leg pain because the ALJ did not rely on any medical authority of record); *Yousif v. Chater*, 901 F. Supp. 1377, 1385 (N.D. Ill. 1995) ("Nowhere in the record is there testimony by a doctor that the pain caused by [the claimant's] condition 'usually' gives rise to the physical manifestations that the ALJ found lacking."). "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F. 3d 966, 970 (7th Cir. 1996).

In finding Royal incredible because he did not exhibit any extended loss of muscle strength or muscle atrophy, the ALJ did not cite any medical evidence or opinions that indicated

that Royal should exhibit those physical manifestations based on his claims or condition. Furthermore, the record does not support the finding that Royal must exhibit muscle atrophy or extended muscle loss to be credible. The Commissioner cited **_Brihn v. Astrue_**, to argue that the ALJ may consider a lack of objective medical evidence, such as muscle atrophy, in assessing credibility. **_Brihn v. Astrue_**, 332 F. App'x 329, 333 (7th Cir. 2009). However, in that case, the ALJ relied on an impartial medical expert who concluded that the claimant's allegation of muscle weakness was unsubstantiated by the lack of strength testing to evaluate the impairment or an exercise routine to counteract atrophy. **_Brihn_**, 332 F. App'x at 331. As discussed above, the medical record is devoid of a medical expert concluding that Royal should exhibit muscle atrophy or extended muscle loss to substantiate his claims. Therefore, the ALJ improperly drew an adverse inference from the lack of evidence of muscle atrophy or extended muscle loss.

Based on the above discussion, the court finds that the ALJ's credibility determination was patently wrong and not substantially supported by the evidence. Although the ALJ properly considered other factors in assessing Royal's credibility, he erred in considering Royal's use of a cane and the allegedly inconsistent statements from May 2011 and 2012. Additionally, he improperly drew negative inferences from Royal's lack of treatment and the lack of evidence of muscle atrophy and extended muscle loss. This court cannot find that the ALJ's credibility determination was supported by substantial evidence and the ALJ is directed to address those issues on remand.

Next, Royal has argued that the ALJ failed to adequately account for all of his impairments in the RFC assessment. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative

Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC

analysis.  This section of the Ruling provides:

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion, citing
> specific medical facts (e.g., laboratory findings) and nonmedical
> evidence (e.g., daily activities, observations).  In assessing RFC,
> the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular
> and continuing basis (i.e., 8 hours a day, for 5 days a week, or an
> equivalent work schedule), and describe the maximum amount of
> each work-related activity the individual can perform based on the
> evidence available in the case record.  The adjudicator must also
> explain how any material inconsistencies or ambiguities in the
> evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted).  Thus, as explained in this section of the Ruling, there is a

difference between what the ALJ must contemplate and what he must articulate in his written

decision.  "The ALJ is not required to address every piece of evidence or testimony presented,

but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v.

Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.

2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).  Although the ALJ does not

need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate

conclusions.  *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not

support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*,

580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v.

Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).  "A decision that lacks adequate discussion of the

issues will be remanded." *Moore*, 743 F.3d at 1121.

First, Royal has argued that the ALJ failed to account for his headaches.  The ALJ found

that Royal's headaches were not a severe medically determinable impairment.  To reach that

conclusion, the ALJ cited medical evidence that was missing from the record.  He indicated that

the headaches were not the result of a serious illness, traumatic brain injury, or a condition such as an aneurysm, tumor, disc disease, or sinus abnormality. The medical records did not document twelve months of ongoing neurological deficits associated with headaches or that the headaches had been accompanied by fever, weakness, loss of balance, falling, numbness, tingling, confusion, personality changes, vision changes, shortness of breath, or dizziness for twelve months. Additionally, the medical records did not document that the headaches occurred in cluster or cyclic formations or were triggered by strenuous activity, exertion, or bending and coughing. Moreover, the medical records did not reflect that the headaches were unresponsive to prescribed treatment including therapy, dietary changes, or medication or that Royal had sought emergency room treatment or hospitalization for uncontrollable headaches. Last, the medical records did not indicate that Royal's treating physicians reported that he had uncontrollable headaches that resulted in significant function limitations for twelve months in duration.

Although the ALJ identified what the medical records did not document or show, Royal argued that the ALJ's insistence upon such evidence was based on his own lay impressions and improper. Furthermore, Royal claimed there was no evidence from any doctor or medical provider that indicated the physical manifestations the ALJ found lacking were required to establish headaches as a medically determinable impairment. Royal also alleged that Dr. Miller diagnosed him with headaches, but did not indicate support in the record. Royal also argued that the ALJ rejected his headache claim solely on the basis that it was not supported by the objective medical evidence. Moreover, he claimed that the ALJ failed to consider his headaches as a symptom of his cervical spine impairment. Additionally, Royal indicated that his headaches started with pain in the back of his neck and moved toward the top of his forehead and that headaches were a possible symptom of cervical spondylosis.

The Commissioner argued that Royal failed to establish a more restrictive RFC than the ALJ. Rather, she claimed that Royal alleged there was sufficient evidence to establish his headaches as a medically determinable impairment but that he failed to demonstrate how the headaches were a severe impairment. Additionally, the Commissioner argued that Royal did not present any evidence that his headaches were a symptom of his cervical spine impairment. Moreover, she indicated that the ALJ's assessment was not based solely on his lay opinion but relied on the lack of evidential support within Royal's medical treatment records.

Although the ALJ identified a lack of evidence in the medical treatment records, it is not clear why the ALJ found the listed factors necessary to establish headaches as a medically determinable impairment. The ALJ did not cite a doctor or other medical source when finding that the above factors were necessary. Additionally, the ALJ did not mention or discuss Royal's allegations of throbbing pain due to headaches or symptoms including nausea, vomiting, and sensitivity to light that may last two to three days. (Tr. 57, 213). Furthermore, the ALJ solely relied on the lack of objective medical evidence for rejecting Royal's headache claim and Royal's credibility determination, which this court has found patently wrong. *See* SSR 96-7p(4) ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."). It is not clear that the ALJ considered Royal's headache allegations because he only discussed the lack of objective medical evidence.

Finally, Royal has alleged that the ALJ failed to consider his myofascial pain syndrome. Royal indicated that he was diagnosed with myofascial pain syndrome but that the ALJ failed to discuss this impairment. However, the Commissioner indicated that the ALJ discussed

fibromyalgia and alleged that myofascial pain syndrome may develop into fibromyalgia in some people.  Additionally, she claimed that Royal failed to present any medical evidence that his limitations stemmed from his myofascial pain syndrome.  Because the ALJ mistakenly discussed fibromyalgia, an impairment that Royal did not allege, instead of the diagnosed myofascial pain syndrome, this court cannot find that the ALJ considered all of Royal's impairments when making his RFC assessment.  The ALJ is directed to address these issues on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this Order.

ENTERED this 12th day of March, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge